UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

YUN YI CHANG,

     Petitioner,

     v.                                      CAUSE NO. 3:25cv1060 DRL-SJF

KRISTI NOEM, TODD LYONS, RUSSELL
HOTT, PAMELA BONDI, and WARDEN,

     Respondents.

OPINION AND ORDER

Immigration detainee Yun Yi Chang, by counsel, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241, alleging he is unlawfully confined in violation of the laws or Constitution of the United States. The respondents answered the petition, and Mr. Chang filed a reply. The petition is ready to be decided.

As a preliminary matter, Mr. Chang was ordered to show cause why every respondent but the Miami Correctional Facility Warden, the only respondent who exercises "day-to-day control" over him, should not be dismissed under *Kholyavskiy v. Achim*, 443 F.3d 946 (7th Cir. 2006). Relying on *Rumsfeld v. Padilla*, 542 U.S. 426 (2004), the court of appeals there concluded the proper respondent in an immigration habeas case challenging the constitutionality of a petitioner's confinement is the warden of the facility where the petitioner is being held, not a supervisory official who has the authority to free the petitioner. *See also Doe v. Garland*, 109 F.4th 1188, 1192 (9th Cir. 2024); *Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 444 (3rd Cir. 2021); *Vasquez v. Reno*, 233 F.3d 688, 696 (1st Cir. 2000). In his reply, Mr. Chang does not contest the dismissal of the non-custodial

respondents. The court concludes that dismissal of the non-custodial respondents is appropriate. For the sake of clarity, the court refers to the responding party as the Warden from this point forward.

According to the petition, Mr. Chang was born in South Korea in 1978. South Korea nonetheless does not reportedly recognize him as a citizen because his parents and grandparents were not South Korean citizens at the time of his birth.[1] He entered the United States at age 6 or 7 as a lawful permanent resident on a Taiwanese travel document. That travel document has long since expired, and he claims that Taiwan also does not recognize him as a citizen. Mr. Chang considers himself to be stateless.

In 1997, Mr. Chang was convicted of second-degree robbery and sentenced to a term of incarceration in Missouri. While there, he was served a notice to appear and ultimately ordered removed to South Korea. The removal order became administratively final in 1999, when the Board of Immigration Appeals (BIA) dismissed his appeal.

When Mr. Chang was released on probation from his criminal sentence in October 2000, he was detained by United States Immigration and Customs Enforcement (ICE). He was released about six months later in March 2001 because there was no significant likelihood of removal within the reasonably foreseeable future. Mr. Chang believes South Korea would not accept him for removal. He was released on a supervision order.

---

[1] The Warden provides an affidavit from an ICE official that states, without explanation, that Mr. Chang is both a national and a citizen of South Korea [7-1]. Though it is undisputed that Mr. Chang is a South Korean national, neither the affidavit nor the response to the petition supplies the basis for contesting South Korea's treatment of him as a noncitizen.

From there, the parties leave Mr. Chang's full history a bit sketchy. He apparently was arrested on another criminal charge around November 2004—one left unspecified on this record. One might presume a conviction because the parties report his release from criminal custody in June 2006, but that too remains unconfirmed. He was then transferred to ICE custody again. He was released that same month on another supervision order because ICE determined there was no significant likelihood of removal within the reasonably foreseeable future. Mr. Chang believes South Korea would not accept him for removal. No one reports any other action for any violation of his supervision order.

In March 2012, Mr. Chang was arrested on another undisclosed criminal charge and sentenced to a term of incarceration. This one likely had to have been more serious because he was not released from criminal custody until August 2023, but once more no one tells the court his crime of conviction or his sentence. He was turned over to ICE custody. He was released on yet another supervision order about a month later in September 2023 because ICE determined there was no significant likelihood of removal within the reasonably foreseeable future. He believes again that South Korea would not accept him for removal. Once more no one reports any other action for any violation of his supervision order.

Mr. Chang's 2023 supervision order placed strict conditions on his release and required periodic check-ins with ICE. The Warden does not dispute that for the next year and a half, he complied with these conditions of release. On March 27, 2025, ICE officers arrested Mr. Chang outside his home in Maryland, citing a "new directive." He reportedly was not given a notice revoking release or any other paperwork explaining why he was being arrested or why his supervised release was being revoked. He asserts that, at the time

3

of his arrest, nothing had changed since his 2023 release regarding the prospects for removal and that ICE lacked any articulable basis to believe South Korea or any other country would accept him for removal. About five months after his arrest, namely in August 2025, ICE requested that Mr. Chang complete a travel document request to Hong Kong, which was submitted. Mr. Chang does not know the result of this request.

In arguing that removal is reasonably foreseeable, the Warden provides a declaration from an ICE official, attesting that ICE Enforcement and Removal Operations (ERO) requested travel documents from South Korea for Mr. Chang on July 24, 2025, and that ICE ERO "continues to work with Headquarters Removal Management Division to attempt to obtain travel documents to remove [Mr. Chang] to South Korea" [7-1].

With his reply, Mr. Chang provided more details about efforts to remove him. He included an affidavit stating that, upon his arrest in March 2025, Officer Kim from the Baltimore ICE Field Office told him that the year before (in May 2024) he attempted to obtain travel documents for Mr. Chang from South Korea and Taiwan, but both governments refused these requests [9-1]. The officer told him his case had been treated as one where no country would accept him. After his March 2025 re-detention, ICE instructed him in April 2025 to complete a travel document application for Taiwan. He says he has never lived in Taiwan, so he was unable to answer many portions of the form, including whether he had family ties there. He believes Taiwan rejected the request.

Mr. Chang next attests that, in July or August 2025, ICE provided him a travel document application for Hong Kong. He has never lived in Hong Kong, has no ties there, and is not a citizen or national of Hong Kong. He completed it to the best of his ability, but

4

was unable to provide information about a passport number and addresses in Hong Kong because he does not have that information.

Mr. Chang relates that, at his 90-day and 180-day custody review, he was told that ICE was still attempting to obtain travel documents. He says the reviews were brief and mostly focused on confirming his address, employment history, and family information, and whether he would comply if released on supervision.

The Warden first argues that this court lacks jurisdiction over Mr. Chang's habeas petition under 8 U.S.C. § 1252(g) and § 1252(b)(9). This court has thoroughly considered its jurisdiction to review post-removal-order immigration detention. Jurisdiction is secure insofar as this opinion goes. *See Liang v. English*, No. 3:25cv1052, 2026 WL 835853, 2-3 (N.D. Ind. Mar. 26, 2026); *see also Clark v. Suarez Martinez*, 543 U.S. 371, 378 (2005); *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001); *Vu v. English*, No. 3:25cv999, 2026 WL 194171, 2-3 (N.D. Ind. Jan. 26, 2026) (discussing § 1252(b)(9) and § 1252(g)); *Kem v. Noem*, No. 3:25cv997, 2026 WL 100566, 1-2 (N.D. Ind. Jan. 14, 2026) (discussing § 1252(g)).

Turning to the merits of the petition, the court follows the analysis set forth in *Zadvydas*, and retraced in *Liang*. By statute, noncitizens who are subject to a final order of removal must be detained for a period of 90 days, during a "removal period." 8 U.S.C. §§ 1231(a)(1), (a)(2). This removal period begins on the latest of three events: (1) the date the removal order becomes administratively final, (2) the date of a reviewing court's final order if the noncitizen seeks judicial review and the court orders a stay of removal, or (3) upon the noncitizen's release from non-immigration confinement. 8 U.S.C. § 1231(a)(1)(B). Mr. Chang's removal period ended at least two decades ago.

Beyond this 90-day period, certain classes of noncitizens may be detained even longer—what the statute calls inadmissible aliens (under 8 U.S.C. § 1182), those who have violated their nonimmigrant status conditions (under 8 U.S.C. § 1227(a)(1)(C)), those who have committed certain crimes, such as aggravated felonies, drug trafficking, or illegal firearm offenses (under 8 U.S.C. § 1227(a)(2)), those removable for national security or foreign relations reasons (under 8 U.S.C. § 1227(a)(4)), and those whom the Attorney General determines to be a risk to the community or unlikely to comply with the order of removal. These noncitizens "may be detained beyond the removal period" or released on conditions of supervision. 8 U.S.C. § 1231(a)(6).[2] No one contests that Mr. Chang's criminal convictions allowed him to be detained beyond the removal period.

"The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law," and "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. To avoid a constitutional due process problem with § 1231(a)(6), including for a noncitizen who remains in the country after being ordered removed, the law requires that his detention be limited to a reasonable time—namely "a period reasonably necessary to bring about that alien's removal from the United States." *Id.* at 689; *see also id.* at 682, 690-91.

---

[2] For noncitizens who don't fall in these categories, if they are not removed during the 90-day removal period, they must be released, subject to conditions of supervision. 8 U.S.C. § 1231(a)(3).

The law materially defers this difficult judgment to the Executive Branch for a total six-month period, as detention is considered presumptively reasonable to execute a removal order. *Id.* at 700-01. This period for Mr. Chang ended, at least initially, when he was released from his first period of ICE custody in March 2001 after approximately six months of detention. Even for this go-around, he has been detained since March 2025, so he has been in custody again for just over a year.

The court has the authority to review a noncitizen's detention and to decide independently whether "a set of particular circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal." *Id.* at 699; *see also* 28 U.S.C. § 2241(c)(3). "In answering that basic question, the habeas court must ask whether detention exceeds a period reasonably necessary to secure removal" and "should measure reasonableness primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal." *Zadvydas*, 533 U.S. at 699. In this, the court listens with care when the government's "foreign policy judgments"—such as the status of repatriation negotiations—are implicated and otherwise affords "appropriate leeway when its judgments rest upon foreign policy expertise." *Id.* at 700. When removal proves reasonably foreseeable, the court can consider other factors (such as risk of crime) and often will deny habeas relief; whereas, when removal seems attenuated or unlikely, the court will order the individual's release, albeit conditioned on appropriate terms of supervision and the noncitizen's compliance with these terms. *See id.* at 699-700.

The petitioner bears the initial burden, and the court sees no cause to change this. *See* 28 U.S.C. § 2241; *Zadvydas*, 533 U.S. at 700; *see also Skaftouros v. United States*, 667 F.3d 144,

158 (2d Cir. 2011); *Espinoza v. Sabol*, 558 F.3d 83, 89 (1st Cir. 2009). If he "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the government must respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701 (cleaned up); *see also Suarez Martinez*, 543 U.S. at 385-86.

Both noncitizens and the government alike must comply with our immigration laws as they are written and as they must work within constitutional constraints. Whatever reservations might exist for someone who has a demonstrated criminal record, even if all its details are unknown, Mr. Chang has met his burden, and the Warden has not rebutted it.

"Despite the old adage, past isn't always prologue in this context, and just because removal couldn't occur before doesn't mean it can't reasonably occur today under renewed efforts. At the same time, nothing in § 1231(a)(6) and nothing in *Zadvydas* suggests that the mere passage of time erases everything about [an] initial showing to make it all irrelevant." *Liang*, 2026 WL 835853 at 4 (citations omitted). The government was unsuccessful in 2001, and in 2006, and in 2023, and now remains so again even after another year of detention since March 2025 (or eight months since the government requested travel documents in July 2025). One ICE officer reportedly said in 2024 that South Korea and Taiwan had refused requests for Mr. Chang's repatriation or removal. ICE's repeated inability to obtain travel documents for him to South Korea for decades, despite widely known (and agency) reports of other removals of noncitizens to South Korea, and the inability to do so either there or anywhere else over the last year tend to make the prospect of removal anytime reasonably soon chancier rather than likelier. And Mr. Chang offers a plausible reason why if South Korea does not recognize him as a citizen and if he has no ties to Taiwan (or Hong Kong).

The Warden identifies South Korea as the only country under consideration for removal. Though a request for travel documents with South Korea may remain pending, the Warden offers nothing particularized to this situation to explain that more time will bear any fruit, or to explain why the renewed effort will likely turn out differently than in years past. The Warden reports no "next steps," no intended follow-up with the South Korean government, no status on repatriation negotiations, and no reason to think this time removal could likely occur within the reasonably foreseeable future. Because Mr. Chang's removal seems not just attenuated but wishful, the court must under the law order his release, albeit conditioned on appropriate terms of supervision and his compliance with these terms. *Zadvydas*, 533 U.S. at 699-700. After all, the choice isn't between detention and "living at large," but between detention and his continued supervision. *Id.* at 696.

Mr. Chang's old criminal activity might place him at higher priority for removal, but he has not been returned to custody this time because of a new crime. And § 1231(a)(6) does not permit indefinite detention. If Mr. Chang commits future crimes or otherwise violates his supervision order, ICE undoubtedly may revoke his release and return him to custody, *see id.* at 700; 8 C.F.R. §§ 241.4(*l*)(1); 241.13(i)(1), though even then the regulation contemplates another six months, not another year. The Department of Homeland Security may seek to impose penalties, including a fine or imprisonment, for willful violations. *See* 8 U.S.C. § 1253(b). Or he might be subject to continued detention under special procedures should he be determined to be specially dangerous. *See Zadvydas*, 533 U.S. at 690-91; 8 C.F.R. § 241.14(f); *see, e.g., Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1248-54 (10th Cir. 2008)

(noting circuit split but determining regulation is constitutional application of § 1231(a)(6)). The government has not invoked any of these procedures or concerns today, however.

As presented, the petition instead rises and falls on § 1231. Because the court finds that his detention is not authorized under § 1231, it is unnecessary to consider his additional arguments that his detention violates due process or that ICE failed to comply with its own regulations in detaining him.

For these reasons, the court:

(1) DISMISSES Former Attorney General Pamela Bondi, Former Secretary of Homeland Security Kristi Noem, Acting Director of Immigration and Customs Enforcement Todd Lyons, and Chicago ICE Field Office Director Russell Hott;

(2) GRANTS the petition for writ of habeas corpus (ECF 1) in part and ORDERS the Warden to release Yun Yi Chang on the same conditions of supervised release that existed before his re-detention and to certify compliance with this order by filing a notice with the court by **April 6, 2026**; and

(3) DIRECTS the clerk to email a copy of this order to the Warden of the Miami Correctional Facility at the Indiana Department of Correction to secure his release; and

(4) ORDERS that any fee petition should be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

SO ORDERED.

April 3, 2026                                    s/ Damon R. Leichty
                                                 Judge, United States District Court

10